Filed 3/29/24  In re M.D. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | B326420 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.D.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 22CCJP04338A |

APPEAL from orders of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Affirmed in part, reversed in part.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Father challenges the juvenile court's jurisdictional finding that he failed to protect his daughter M.D. (born January 2011) from mother's substance abuse.[1]  He also challenges the court's dispositional orders that he participate in individual counseling and random, on-demand drug testing.  Substantial evidence supports the court's jurisdictional finding, which we affirm. We also conclude the court reasonably exercised its discretion in ordering father to participate in individual counseling.  We agree with father, however, that there is no basis in the record to require him to undergo random and on-demand drug testing. Accordingly, we reverse that portion of the court's dispositional order and remand the matter for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    *Investigation*

In late October 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a report that mother had tested positive for marijuana and amphetamine when she gave birth to O.S. (M.D.'s half-brother) the day before. Mother admitted consuming "edibles" for insomnia and bone pain but denied knowingly consuming amphetamines.  James, who is not a party to this appeal, is the father of O.S. and mother's then-one-year-old child N.S.  Each of mother's three other children has a different father:  S.B. (then age two), I.G. (then age 17), and M.D. (then age 11).  The children, except for I.G., lived with

---

[1]    Mother also appealed.  This court dismissed mother's appeal after her appellate counsel filed a brief under *In re Phoenix H.* (2009) 47 Cal.4th 835.

mother and maternal grandmother.[2]  Only M.D. is the subject of this appeal.

A social worker interviewed mother at the hospital. Mother said father was "not active in" M.D.'s life, and "his whereabouts are unknown."  She said the only drug she ever had used was marijuana, and she had been using it for about 15 years.  Mother did not inhale marijuana—she consumed edibles "laced with marijuana."  Mother believed an edible she had a week earlier may also have been laced with amphetamines, leading to her positive test.  James also disclosed marijuana use. He had no knowledge of mother using any drug other than marijuana.[3]

They both signed a safety plan, agreeing mother and the children would stay with maternal grandmother, and agreed to drug test on demand.  Maternal grandmother agreed to supervise the children.  She had no concerns about how mother cared for them.  She also denied any knowledge of substance abuse by mother or James.

The social worker also spoke to M.D.  M.D. stated she had been living with mother but began living with paternal grandmother in August 2022 due to mother's "high risk" pregnancy.  M.D. felt safe with paternal grandmother.  She maintained regular contact, and had good relationships, with

---

[2]    I.G. lived with his father.  DCFS did not initiate dependency proceedings with respect to him.

[3]    Although mother and James denied being married or living together, during the investigation DCFS learned they had married in February 2021.

mother, her half-siblings, and maternal grandmother.  Father did not live with paternal grandmother.  M.D. said "she had not seen or talked with him for a long time."  M.D. denied ever having seen mother smoke anything.  She believed mother took good care of her and her siblings.

Paternal grandmother told the social worker she "always" had been in M.D.'s life, "since birth."  She had no concerns with how mother cared for M.D.  Mother had arranged for M.D. to stay with her so mother could "deal with her pregnancy and have better control of her other children."  As M.D. had started school near paternal grandmother, mother let M.D. continue to stay with her.  M.D. was doing well in school.  Paternal grandmother was tending to M.D.'s medical, dental, and educational needs.  Paternal grandmother also did not know where father was and confirmed he was not active in M.D.'s life.  She was interested in having M.D. placed with her if M.D. were detained from mother.

On October 31, 2022, DCFS obtained and served a removal order for M.D. and her three younger siblings.  Initially, M.D. was allowed to remain with paternal grandmother.  She ultimately was placed with a maternal cousin along with S.B.[4]

Mother's on-demand drug test from October 31, 2022 came back positive for marijuana but no other substances.

## 2.    *Petition and detention*

On November 2, 2022, DCFS filed a petition under Welfare and Institutions Code[5] section 300 on behalf of M.D. and

---

[4]    DCFS had learned paternal grandmother had a criminal history that required a waiver.

[5]    Statutory references are to the Welfare and Institutions Code.

her younger siblings, alleging they were at risk of harm due to mother's 15-year history of substance abuse and current amphetamine, methamphetamine, and marijuana use. The petition also alleged mother had mental and emotional problems.

At the detention hearing, the court found a prima facie case the children are persons described by section 300. The court found father, who was not present, to be the presumed father of M.D. The court ordered DCFS to initiate a due diligence search to provide father with notice. The children were detained from their respective parents.

### 3. *Jurisdiction/disposition report*

DCFS filed a jurisdiction/disposition report with the court on December 14, 2022. By that time, DCFS had received O.S.'s meconium test results, which were positive for cannabinoids and Carboxy THC but negative for amphetamines and other substances. DCFS also had located father. He was living in Bakersfield. DCFS was in the process of filing a first amended petition to add allegations that father knew of mother's substance abuse and failed to protect M.D., endangering her health and safety, and placing her at substantial risk of serious harm.

### a. *Background information*

The report noted the children had no dependency history, but DCFS had received prior reports of neglect. As to M.D., in October 2011—when M.D. was less than a year old—DCFS received a call alleging mother had been using marijuana in front of M.D. and I.G. and had left the marijuana bag and an alcohol bottle on a potentially accessible counter. The allegations were deemed "unfounded." In October 2016, DCFS received a call about M.D.'s acting out in school, including "aggressive/sexual behavior." The caller was concerned M.D. may have viewed

age-inappropriate material at home. Again, the allegations were "unfounded." And, in June 2020, mother was reported as having tested positive for marijuana before S.B.'s birth. In June 2019, mother had tested positive for amphetamine and cannabinoids. Mother denied having taken amphetamines. The allegations did not meet the criteria for abuse or neglect—DCFS referred the family for services.

DCFS also reported on parents' criminal history. James had been convicted of felony possession/purchase for sale of narcotics or a controlled substance and three other convictions. He also had several arrests. DCFS described father as having "an extensive criminal history, including numerous arrests as a minor." As an adult, he had been convicted of a felony burglary in June 2019 and a misdemeanor for "[o]bstructing a [p]ublic [o]fficer" in February 2016. He had "multiple prior arrests" for obstructing a public officer, "[d]isorderly [c]onduct: [i]ntoxicated [d]rugs/[a]lcohol," and in May 2022, carrying a concealed weapon.[6] Mother had a few misdemeanor convictions from 2008 and 2009.

b.    *Investigation of allegations against mother*

The DCFS dependency investigator (DI) interviewed parents, M.D., and other relatives. Mother said she'd " 'never done drugs.' " She got her medical marijuana card as a teenager and began smoking regularly when she was about 22 years old. (Mother was 33 years old.) She also consumed edibles and used

---

6      DCFS did not report the date of father's arrests for obstruction and disorderly conduct. As for the May 2022 firearm arrest, father explained the firearm belonged to his friend. The case had been dismissed.

oils with "a combination of CBD and THC." Mother insisted her marijuana use "has never affected her ability to parent her children." She said she used marijuana when her children were sleeping or at their grandparents, not during the day. At most, she used marijuana about three times a week. If she smoked marijuana, she did so outside or at a friend's home. She stored her marijuana in a lock box that she kept in a cabinet. James confirmed mother used marijuana but no other drugs. He told the DI someone else always was present with the children if mother decided to have an edible.

Mother denied ever having used methamphetamine; she had " 'never taken any hard drug.' " Mother did not know why she tested positive for amphetamine at O.S.'s birth. Mother suffered from chronic back pain for which she had been prescribed tramadol and Norco. Mother also told the DI she suffered from severe anxiety, depression, and " 'social phobia.' " She had been prescribed several medications for those conditions, including lorazepam for anxiety and trazodone for insomnia, both of which she took daily. She used to take Xanax and Prozac. She now claimed the positive test must have come from one of her medications. Mother agreed to give the DI a list of her medications but refused to drug test on demand until DCFS had the complete list. As of the date of the report, mother had not done so.[7]

---

[7] Mother ultimately gave DCFS documentation concerning her medications shortly before the January 13, 2023 adjudication hearing. At that hearing, DCFS's counsel asserted nothing on the list would have screened positive for amphetamine.

As for her relationship with father, mother said they had met in 2010 and were together for about five and a half years. She had no concerns about father's or James's ability to care for their respective children.

The DI reviewed the substance abuse allegations against mother with father. He responded, " 'That sounds like her.' " Father said mother "has 'always' used drugs." He knew about "mother's ongoing drug use because he sees her 'around the wrong people[,]' and he hears about her from other people." Father was " 'quite sure' . . . mother uses methamphetamine, cocaine, marijuana and 'party drugs.' " Father described mother as a " 'party person' " and said mother would use " 'any type of pills' and any drug she [could] access that would get her high." According to father, mother had " 'always been like that.' " She was using drugs "years ago" when they still were together. He said he had "witnessed her using various drugs, including methamphetamine and cocaine." Father added, " 'That's one of the reasons the relationship fell apart.' "

Father believed "mother's drug use in itself [did] not affect her parenting." He said " 'it's her environment that's bad.' " Father stated, " 'It's not what you do, is [*sic*] how you're doing it.' " He thought mother did not maintain stability for her children—they had been " 'house to house.' " Father also reported mother was " 'quick to drop her kids off' and 'send them to somebody while she's doing what she do.' " He complained mother would never send M.D. to stay with him for "fear that it would 'make her look bad.' " Instead, she "frequently sent" M.D. to stay with paternal grandmother, whom father said "provide[d] the child with no discipline." Father was aware mother had anxiety and a history of depression but didn't believe it affected

her parenting.  Father believed mother never intentionally would place her children in harm's way.  He was concerned, however, "that no one has been providing supervision to [M.D.] so, 'she's raising herself and probably taking care of her siblings too.' "

The DI met with M.D.  M.D. said she went to stay with paternal grandmother when mother was pregnant with N.S. (born June 2021).  Because M.D. had started school there, mother thought it was best for M.D. to finish the school year living with paternal grandmother.  M.D. told the DI she decided to stay with paternal grandmother the following (current) school year.  She remained there until she was detained.  M.D. said she still saw her mother almost every day during the time she lived with paternal grandmother.  M.D. enjoyed spending time with mother and said they had " 'a good bond.' "

M.D. told the DI mother did not use drugs, and she never had had a reason to suspect that mother (or James) did.  M.D. said mother occasionally drank alcohol on special occasions but was not an alcoholic.  M.D. never had seen mother drunk. The DI asked M.D. about her knowledge of the allegations against mother.  She replied, " 'I know my mom's story' and 'I don't know if she's trying to protect me by not telling me the truth or if she is telling the truth.' "  M.D. knew mother had tested positive for amphetamine and that amphetamine is an ingredient in some prescriptions.  She at first said she saw mother smoke marijuana " 'like once,' " but then wasn't sure if it had been more than one time.  M.D. also denied that mother appeared mentally or emotionally unstable.  M.D. wanted to participate in counseling.

The DI met with James's sister (aunt), with whom N.S. and newborn O.S. were placed.  The children were doing well,

9

but O.S. initially had experienced withdrawal symptoms. In 2020—before N.S. and O.S. were born and S.B. was a baby— James, mother, and mother's children had lived with aunt. According to aunt, mother seemed " 'detached' " from her children during that time. She said M.D. cared "for the younger children, more so than . . . mother." Aunt thought M.D. had "been exposed to things" inappropriate for a child. She said mother did not properly supervise M.D.: when M.D. was about seven years old, mother allowed M.D. to use the stove without supervision; M.D. wandered into aunt's room and found aunt's "private belongings"; and M.D. "rarely" went to school because mother "did not require her to do so." M.D. spent most of her time in paternal grandmother's care.

When asked about substance abuse, aunt said she did not suspect drug use by mother at first. After aunt moved out, however, mother "started displaying bizarre behaviors." Nevertheless, aunt never had seen mother use drugs. She had seen mother and James drink " 'hard alcohol' every night," however. Aunt also believed mother was "mentally unstable."

Maternal cousin, who was caring for M.D. and S.B., confirmed M.D. had been living with paternal grandmother for the past two years "off and on." She told the DI she had suspected mother used drugs but "never had any proof." She knew mother used marijuana to relieve "severe back pain." She also was aware mother " 'battled depression.' "

c. *Information about father*

Paternal grandmother raised father. Father said he spent a significant part of his childhood in juvenile hall. He wasn't involved in a gang but lived "that lifestyle" and " 'was into guns and stuff like that.' " Father denied having a history of drug-

10

or alcohol-related arrests. He said his most recent arrest was the one for possession of a firearm.

Father (born 1993) met mother when he was 17, shortly after he was released from a correctional camp in 2010. She quickly became pregnant with M.D. Father said they were together for about a year and a half. He said his relationship with mother ended because she got romantically involved with some of his friends and was using drugs.[8] When M.D. was younger, she lived with father for five months—mother " 'disappeared' during that time." Father explained that a "few years ago" he tried to seek full custody of M.D., but he filled out the paperwork incorrectly, and his request was " 'denied.' " M.D. had been in his care for a few months, but he had had to return her to mother upon mother's repeated requests. M.D. also lived with father about three years earlier when he moved to Bakersfield. Father sent M.D. back to mother, however, because he and his live-in girlfriend C.H. had separated.

Father and C.H. had since resumed their relationship. They met in 2015 and had been together for the past seven years. Father said that, due to mother, he rarely had been able to see M.D. since beginning his relationship with C.H. Mother didn't let him see his daughter " 'at all.' " Rather, mother and paternal grandmother called him when M.D. needed something or "got in trouble." They expected him to reprimand M.D. about her behavior but would not allow him to spend time with her.

---

[8] Mother said the relationship ended because father—who was a few years younger than mother and 17 when M.D. was born—wasn't mature enough.

Father denied any medical or mental health issues. In July 2022, however, he suffered two gunshot wounds but had recovered.[9] (A man who had broken into father's house, and with whom father later got into an altercation, had shot at father outside father's friend's house, striking him twice.) Father said he "smokes marijuana daily, approximately three times a day, at 'breakfast, lunch, and dinner.'" He had been smoking marijuana "off and on" since he was a teenager. Father said he does not smoke marijuana in his children's presence.[10] He smokes it in his garage. Sometimes when the children are asleep, he and C.H. will smoke in their bedroom. Father said he stores his marijuana in a box in his closet where the children do not go. He denied having used any other drugs and said he drank alcoholic beverages "occasionally"—a beer every other day and "'hard liquor'" about twice a month.

Father stated he loved his children and spending time with them. He described himself as a "'fun stepdad and dad.'" He said he attends sports practices for his stepchildren and provides his "children/stepchildren with structure and routine." He told the DI he "needs to be involved in [M.D.'s] life, and not just to provide financially and to discipline her." Father explained he only had been able to take M.D. on outings the last few times he had seen her. He wanted to be able to have extended weekend and summer visits with M.D. at his home.

---

[9]    According to paternal grandmother, father last was seen a few weeks before this incident.

[10]    C.H. had children. Father referred to them as his stepchildren or children.

He did not want to take M.D. from mother but wanted to share physical custody. He did not mind M.D. staying with paternal grandmother or maternal cousin but wanted to approve where M.D. lived. He wanted what was " 'best for' " her. Mother was open to joint custody but only if M.D.'s primary residence was with her.

Father thought one reason M.D. did not want to live with him was because there was "discipline and structure in his home." He said mother and paternal grandmother let M.D. "do whatever she wants." He thought M.D. had been " 'brainwashed' to feel a certain way about him and [C.H.]." M.D. also got overwhelmed around C.H.'s six children. Father was interested in full custody of M.D. but would "take 'whatever [amount of custody/visitation that he] can get' because he just wants to have a relationship with the child." (Alteration in original.) Although he did not want to take M.D. away from mother, he did not believe she should have custody of M.D. right now "if she is not 'in the right space.' " Father thought M.D. should stay with him for a while, as he was in a better place than mother.

M.D. told the DI, " 'I know [father] loves me' and 'we have a good bond.' " But M.D. had concerns. She didn't think father communicated well and said he " 'doesn't hear [her] voice.' " (Alteration in original.) M.D. mentioned father having been shot recently and said C.H.'s son, about M.D.'s age, also recently was shot. M.D. thought "these incidents happened due to father trusting the wrong people." She was afraid she could have been shot had she been with father at that time. She also thought C.H. and her children treated her "badly." M.D. loved father

but did not want to live with him.  She was open to having visits with him but not at his home in Bakersfield.

Maternal cousin knew father loved M.D. and believed he would protect her and would not cause her any harm.  She knew M.D. did not want to live with him, however, and hoped he wouldn't force her to do so.

DCFS concluded father "knew of the mother's ongoing substance abuse and reported concerns regarding the mother's instability; however, he failed to take actions to protect [M.D.].  Further, [father] is a frequent user of marijuana, he has a substantial criminal history[,] and [M.D.] has expressed an unwillingness to reside in the father's home."  DCFS recommended the court sustain the petition's allegations and declare the children dependents.  It recommended father participate in parent education, individual counseling to address protective parenting, past trauma, and any other case-related issues, and conjoint counseling with M.D.; and comply with random and on-demand drug and alcohol testing.

On December 20, 2022, DCFS filed its first amended petition adding allegations that father knew about mother's substance abuse and failed to protect M.D.  Father was appointed counsel on December 21, 2022.

The juvenile court held an adjudication hearing on January 13, 2023.  The children's counsel asked the court to sustain the substance abuse allegations against mother and the failure to protect allegations against father and James.  Mother's counsel, joined by James's counsel, asked the court to dismiss the petition in its entirety.

Father's counsel asked the court to strike the failure to protect allegations against him.  Counsel argued father was open

14

and honest about mother's drug use, ended his relationship with her due to her drug use, and had attempted to gain custody of M.D. Counsel argued father had tried to be protective: he made it clear he did not condone mother's drug use, removed himself from the relationship, and had taken care of M.D. for "long periods of time when mother [was] unable to." Counsel also argued mother had "not exactly been letting [father] see . . . [M.D.] at all." Counsel concluded, "So, if anything, we would ask the court to amend the petition to conform to proof to say that father was unable to protect as opposed to a failure to protect."

Counsel for DCFS asked the court to sustain the petition as pleaded. As to the allegations of father's failure to protect, counsel argued, "[T]his isn't about blaming him. However, it's clear that he was fully aware that mother was an active, ongoing abuser of drugs including methamphetamine." Addressing the idea father was " 'unable to protect' " M.D., DCFS argued "[it] would be one thing if he went to family court and followed through and attempted to convince the judge and was denied." Instead, counsel argued, father "put in paperwork one time, it got rejected for being improper, and that seems to be the totality of his efforts over a number of years." Counsel was hopeful father would be able to reunify with M.D. but believed he had failed to protect her.

The court sustained the substance abuse count as alleged, including father's failure to protect M.D. The court dismissed the second count as to mother's mental health. The court immediately moved to the disposition.

Father's counsel asked the court to grant DCFS discretion to release M.D. to him and for a written visitation schedule. Counsel objected to the inclusion of drug testing in father's case

15

plan.  Counsel asked that father be required to test "only upon reasonable suspicion," as marijuana use was legal in California and father was noncustodial.  Father submitted to the ordered parenting classes and family therapy but objected to individual therapy.  Counsel argued it wasn't "exactly warranted in this case to father," noting he denied mental health issues.

In response, DCFS's counsel asserted father "also has a lengthy criminal history that includes multiple arrests for possession of narcotics" and had been absent from M.D.'s life "for quite a period of time."[11]  Counsel argued that, if father was seeking to reunify with M.D., "his sobriety would need to be established today."  As to individual counseling, counsel noted father had not acted in a protective capacity as a parent in a number of years.

At the end of argument, the court declared M.D. and the other children dependents of the juvenile court under section 300, subdivision (b), removed them from parental custody, and ordered DCFS to provide parents with reunification services.  The court granted DCFS authority to release the children to mother after she had completed four negative drug tests.  The court also signed father's case plan "as is."  Father appealed.

## DISCUSSION

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. . . .  "[W]e draw all reasonable inferences from

---

[11]  Counsel appears to have confused James's criminal record with father's.

the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 412 (*L.B.*).)

1. ***The court's jurisdictional finding based on father's failure to protect M.D. from mother's substance abuse***

The juvenile court sustained the following allegations against father as pleaded in the amended petition:

> "The child [M.D.'s] father . . . knew of the mother's substance abuse and failed to protect the child. . . . The mother's substance abuse and [M.D.'s] . . . father's failure to protect the child[ ] endangers the child[']s physical health and safety, placing the child[ ] at substantial risk of serious physical harm, damage, danger[,] and failure to protect." (Boldface omitted.)

Father challenges this jurisdictional finding—that he failed to protect M.D. from the risk of harm mother's substance abuse

17

posed to her.[12]  He contends DCFS failed to satisfy its burden to prove "a sufficient nexus between any inaction by [f]ather and the substantial risk of serious physical harm posed to [M.D.] by [m]other" due to her substance abuse.

   a.   *Applicable law*

DCFS had the burden of proving by a preponderance of the evidence that M.D. is a dependent of the juvenile court under section 300.  (§ 355, subd. (a); *I.J., supra*, 56 Cal.4th at p. 773.) Section 300, subdivision (b)(1) authorizes the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of"—as relevant here—"[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" (§ 300, subd. (b)(1)(A)); or "[t]he willful or negligent failure of the child's parent . . . to adequately supervise

―――――――――

[12]   Father does not challenge the court's jurisdictional findings based on mother's substance abuse.  (§ 300, subd. (b)(1)(D) [providing dependency jurisdiction for a child who has suffered, or is at substantial risk of suffering, serious physical harm due to parent's inability "to provide regular care for the child due to the parent's . . . substance abuse"].)  The outcome of father's appeal thus will not change M.D.'s dependency status.  (*In re D.P.* (2023) 14 Cal.5th 266, 283 [" ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate" ' "].)  Nevertheless, father's appeal is not moot— nor does DCFS contend that it is—because the jurisdictional finding against him arguably formed the basis of the court's dispositional orders that father also challenges.  (*Id.* at pp. 277– 278 ["a case is not moot where a jurisdictional finding . . . 'has resulted in [dispositional] orders which continue to adversely affect' a parent"].)

18

or protect the child from the conduct of the custodian with whom the child has been left" (§ 300, subd. (b)(1)(B)). "A jurisdiction finding under section 300, subdivision (b)(1), requires [DCFS] to prove three elements: (1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.)

The statute permits jurisdiction under this subdivision "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(3).) Thus, "[t]he relevant inquiry . . . is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*L.B., supra*, 88 Cal.App.5th at p. 411.) In enacting section 300, however, the Legislature intended to protect children who are currently being abused or neglected *and* "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Accordingly, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citation.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216, disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18 (*N.R.*); see also *In re J.N.* (2021) 62 Cal.App.5th 767, 775 [Department "must establish a nexus between the parent's past conduct and the current risk of harm"].)

19

b.    *The failure to protect finding was not based on father's failure to seek custody of M.D. alone*

Father first contends DCFS impermissibly based its allegation that he failed to protect M.D. on his failure to seek a court order for custody of M.D.  We reject this contention.

Section 300, subdivision (b)(2)(B) directs that "[a] child shall not be found to be a person described by this subdivision *solely due to . . .* [t]he failure of the child's parent or alleged parent to seek court orders for custody of the child."  (Italics added.)  Thus, the court did not err in considering the fact father never tried to correct his rejected paperwork and re-file for custody of M.D. in determining father failed to protect her, as long as it was not the sole basis for the court's jurisdictional finding.  The legislative history, on which both father and DCFS rely, supports this construction.  As discussed in *L.B.*, the author of the relevant assembly bill was quoted as follows:

> " ' "A parent is not unfit *solely because* they are not litigious, lacking the money or sophistication or time to seek legal redress of family issues in court actions.  Likewise, a parent is not unfit *solely because* they try to work out issues with another parent informally and collaboratively, without seeking formal court orders.  Even so, *in rare but not uncommon cases, child welfare agencies will allege that a parent has failed to protect a child under WIC 300 solely on the single ground that the parent did not initiate child-protecting litigation against another parent.*  Such allegations penalize and seek to rupture

20

families based on either their poverty, lack of legal sophistication, or efforts informally to resolve family issues. *Inspired by current law's treatment of lack [of] emergency shelter, which, too, cannot all by itself be the basis of a Section 300 allegation [citation], [this bill] narrowly* addresses this problem simply by saying that *an alleged failure to seek protection for a child by initiating litigation, while permitted as one of the factors in weighing whether a parent has adequately protected a child, cannot all by itself serve as the basis of a WIC section 300 allegation." '"* (*L.B., supra*, 88 Cal.App.5th at p. 414, quoting Assem. Com. on Human Services, Analysis of Assem. Bill No. 841 (2021–2022 Reg. Sess.) as amended Mar. 23, 2021, p. 3; italics added by court.)[13]

Based on our review of the record, we can infer the trial court did not base its failure to protect finding on father's failure to seek custody of M.D. *alone.* As we discuss more fully below, the record demonstrates, as DCFS notes, father did not take any measures to protect M.D. during the years before or after he filed the rejected custody documents. Not only did father never attempt to re-file the documents to establish custody of M.D., by all accounts he was not involved in M.D.'s life. When DCFS

---

[13] Father omits the author's statement that a court still is able to consider a parent's failure to initiate custody proceedings in weighing whether the parent adequately protected a child.

first investigated the matter, no one knew where father was, and M.D. had neither seen nor talked to him "for a long time."

**2.    *Substantial evidence supports the court's jurisdictional finding as to father***

Father alternatively contends DCFS failed to prove his conduct was neglectful.  Father challenges the petition's allegation that he " 'knew of mother's substance abuse,' " arguing for the first time on appeal that his knowledge of mother's current drug use was based only on "hearsay accounts from other people."  He argues he had "no personal knowledge of her drug use since they broke up 11 years prior."  The evidence shows otherwise.

Father concedes he knew mother abused drugs in the past, and the evidence supports the court's implicit finding that he was aware of—or should have been aware of—mother's current substance abuse.  As DCFS reported, father wasn't surprised by the petition's allegations that mother had a positive drug test for amphetamine and marijuana at M.D.'s half-sibling's birth.  Father said mother had " 'always' used drugs," including methamphetamine, cocaine, and " 'any type of pills' " she could access.  According to the jurisdiction/disposition report, father told the DI "he is 'quite sure' that the mother *uses* methamphetamine, cocaine, marijuana and 'party drugs.' " (Italics added.)  Father revealed he knew about mother's "*ongoing* drug use because he *sees her* 'around the wrong people[,]' and he hears about her from other people because 'Lancaster is small' and many people know him."  (Italics added.)  Accordingly, father's knowledge about mother's current drug use was not limited to "hearsay" as he contends.  Moreover, the court could interpret father's statements to the DI as his having inferred

22

mother continued to use drugs based on his personal knowledge about the people with whom he knew mother was associating.

Father argues that, even if he knew about mother's substance abuse, that knowledge was insufficient to support a finding that he was neglectful in failing to protect M.D. Father argues he knew mother left M.D. in paternal grandmother's and others' care and had no "knowledge of a single instance that [M.D.] was harmed or placed at a substantial risk of serious physical harm *as a result of* [m]other's 'substance abuse.' " Father relies on *N.R.*, where our high court recently held the meaning of "substance abuse," as used in section 300, subdivision (b)(1)(D), means "the excessive use of drugs or alcohol." (*N.R., supra*, 15 Cal.5th at p. 531.) In so holding, the court cautioned "that for dependency jurisdiction to exist due to substance abuse pursuant to section 300(b)(1)(D), this abuse must render a parent or guardian unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness." (*Ibid.*)[14]

---

[14] The *N.R.* court also rejected the "tender years presumption." (*N.R., supra*, 15 Cal.5th at pp. 531–532 [holding the age of the child "may bear upon whether substance abuse renders a parent . . . unable to provide that child with regular care, and whether the child is thereby placed at substantial risk of serious physical harm or illness," but courts may not "treat a showing of substance abuse as always being sufficient on its own to establish these other requirements for dependency jurisdiction"].) The *N.R.* opinion was filed on December 14, 2023, before DCFS filed its respondent's brief.

Father argues that, similarly, a finding that he failed to protect M.D. under section 300, subdivision(b)(1)(A) or (b)(1)(B) cannot be based solely on his knowledge that mother was abusing substances. Father thus contends that, while he may have known mother was using drugs, he "did not know that she was unable to provide regular care to [M.D.] and that this inability had placed [M.D.] at a substantial risk of serious physical harm." Father argues DCFS suggests father "had a duty to presume harm based on [m]other's 'substance abuse' alone."[15]

We disagree. Father may not have had a sufficient basis, as father seems to argue, to challenge mother's custodial rights or to report mother to the police, as he had no information that mother actually had cared for M.D. while impaired from drug use. Nevertheless, father could not simply put his head in the sand as to the risk mother's substance abuse posed to his preteen daughter and then claim to have been unaware of any risk. (See *Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104 [" 'The purpose of dependency proceedings is to prevent risk, not ignore it.' "].)

Rather, the court reasonably could infer from the evidence —viewed in the light most favorable to its findings—that father

---

[15] As we said, father does not challenge the evidentiary bases for the jurisdictional findings based on mother's substance abuse. And, as we dismissed mother's appeal after her counsel found no appealable issues—and mother filed nothing in writing containing any contentions she believed we should consider— we presume substantial evidence supports the court's finding that mother's inability to provide regular care for M.D. due to her substance abuse placed M.D. at risk of serious physical harm.

not only knew mother abused substances but also had a reason to believe mother was unable to provide regular supervision for M.D., placing her at substantial risk of harm. Father believed mother's " 'environment [was] bad' "—presumably as a result of her substance abuse. He told the DI mother did not provide stability for the children, which included M.D. And father's concerns were significant enough to prompt him to seek custody of M.D., but, as we discussed, he never tried to re-file his paperwork after it was rejected.

Father argues he did not believe mother's drug use placed M.D. at risk of physical harm because he believed others—primarily paternal grandmother—cared for M.D. when mother was under the influence. In father's words, mother sent her children " 'to somebody while she's doing what she do.' " Even with paternal grandmother's involvement in M.D.'s care, however, father was concerned that "no one" was supervising M.D., and she was " 'raising herself.' " The court reasonably could find father at least should have known such lack of supervision placed M.D.—an impressionable preteen— at substantial risk of harm.

Moreover, mother's substance abuse was severe enough to have contributed to the demise of father's relationship with her. Yet, based on the record, father took no steps to ensure M.D. was protected from it. As DCFS notes, paternal grandmother—with whom M.D. had been living "off and on" for the past two years— was unaware of mother's substance abuse issues. The court thus could infer father never told paternal grandmother that mother used drugs or that she should ensure mother was not under the influence before releasing M.D. to her. Indeed, paternal grandmother hadn't seen father since before he was shot in

May 2022.  Nor had M.D. seen or heard from father in a "long time."  Father thus had not even checked on M.D.'s well-being for many months despite his knowledge of mother's "ongoing" substance abuse and concerns his daughter lacked appropriate supervision.

Accordingly, the court reasonably could find father's failure to take any protective action placed M.D. at substantial risk of harm, as she continued to spend time with mother almost daily, even while living with paternal grandmother.  (See § 300.2, subd. (a) ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].)

Finally, it would be reasonable for the juvenile court to find father still unable to protect M.D. adequately by the time of the jurisdictional hearing despite his plans to play a greater role in her life.  The court could find father still had not demonstrated he could protect M.D., as the evidence showed he minimized the risk mother's substance abuse posed to the child:  he told DCFS he didn't believe it affected her parenting, despite having acknowledged mother was in a bad environment and believing he was "in a better place than . . . mother."  (See, e.g., *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].)  Moreover, as there was no evidence M.D. would continue to live with paternal grandmother (or maternal cousin) after the school year ended given mother no longer was pregnant—the impetus for M.D.'s stay with paternal grandmother—father also could not rely on her to monitor the situation for him.  In any event, the court could infer from the record that father and paternal grandmother

did not have much of a relationship and his past lack of communication with her would continue.

We recognize this is a close case. With the exception of James's sister, the witnesses DCFS interviewed, including paternal grandmother and maternal cousin, had no concerns about mother's care of M.D. Nor did M.D. have any concerns about mother using drugs. Moreover, M.D. was doing well in school, and paternal grandmother was providing for her medical, dental, and education needs. Yet, it is not our place to reweigh the evidence nor exercise our independent judgment. Viewing the record in the light most favorable to the juvenile court's determinations—and drawing all reasonable inferences from the evidence to support the court's orders—we conclude substantial evidence supports the court's implied finding that father's failure to protect M.D. from mother's substance abuse placed M.D. at a substantial risk of physical harm.

3. *The court's disposition orders*

Father argues the court abused its discretion by requiring him to participate in on-demand, random drug testing and individual counseling as part of his case plan.

"We review the juvenile court's disposition case plan for an abuse of discretion. 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071 (*D.P.*).) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851.)

"Section 362, subdivision (d) authorizes the juvenile court to 'direct any reasonable orders to the parents' of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child." (*D.P., supra*, 44 Cal.App.5th at p. 1071; see also § 362, subd. (a).) "The order may include 'a direction to participate in a counseling or education program,' provided that the 'program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' " (*D.P.*, at p. 1071, quoting § 362, subd. (d).)

"The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) Thus, "the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*Ibid*.)

Nevertheless, "the court cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child." (*In re M.R.* (2020) 48 Cal.App.5th 412, 424 (*M.R.*).)

a.    *Drug testing*

Father objected to DCFS's recommendation that his case plan include random and on-demand drug and alcohol testing. His counsel asked that father be required to drug test only upon a reasonable suspicion given marijuana is legal in California, and father was the noncustodial parent. In response, DCFS's counsel

28

"note[d]"—incorrectly—"father also has a lengthy criminal history that includes multiple arrests for possession of narcotics," and argued father's "sobriety would need to be established today" if he were seeking to reunify with M.D. The court signed father's case plan "as is." The final, court-ordered case plan states that "[i]f any test is missed (unexcused) or positive, DCFS may walk the matter on calendar for further orders."

We agree with father that, based on the evidence as a whole, the random, on-demand drug testing component of his case plan was not reasonably designed to eliminate the circumstances that led to M.D.'s dependency. First, although father admitted using marijuana daily, DCFS presented no evidence father ever used marijuana in M.D.'s or his "stepchildren's" presence, or was impaired by marijuana,[16] alcohol, or any other drug while caring for M.D. or the other children. Nor did DCFS present evidence father used or abused any other drugs or that drug use was a factor in his failure to protect M.D.

DCFS nevertheless argues father's minimization of mother's substance abuse, his arrest for "[d]isorderly [c]onduct: [i]ntoxicated [d]rugs/[a]lcohol," and his failure to protect M.D. from mother's substance abuse "provided a reasonable basis for

_____

[16] As father notes, section 328.2, effective January 1, 2023—before the jurisdiction/disposition hearing in this case—provides for the update of all regulations and instructions relating to investigations under section 300 "to ensure that, when a social worker is investigating an alleged case of child abuse or neglect, a parent's or guardian's use or possession of cannabis is treated in the same manner as a parent's or guardian's use or possession of alcohol and legally prescribed medication." (§ 328.2.)

the court to ensure there was not an underlying substance abuse problem with unknown substances that caused or contributed to father's neglectful conduct." In essence, DCFS argues random, on-demand drug testing was reasonable in case father had an underlying substance abuse problem that it didn't know about.

Nor can we ignore DCFS's counsel's mistaken representation to the court that father had "multiple" arrests for narcotics possession, which counsel argued supported the random, on-demand drug testing requirement. Had father had a history of arrests or convictions for possession of narcotics, the court may have had a reasonable basis for ordering the random, on-demand drug testing. But it was James, not father, who had been convicted of narcotics possession. Father had a criminal history but no narcotics-based arrests or convictions. Nor does the evidence show father had been convicted of or arrested for driving under the influence. DCFS mentions father's arrest for disorderly conduct, which was based on intoxication, but there is no evidence as to how long ago that arrest occurred, any associated conviction, or whether father was intoxicated due to alcohol, marijuana, or some other drug.

Although the court was not limited to its jurisdictional findings in determining what disposition orders would be in M.D.'s best interests, the court's discretion did not extend to imposing a requirement designed to alleviate a problem DCFS only could speculate about. (See, e.g., *M.R., supra*, 48 Cal.App.5th at p. 427, fn. 7 ["a case plan cannot include a substance abuse component before there is evidence the parent has a substance abuse problem"].) On remand, the court, in its discretion, may hold further proceedings to determine whether the current circumstances necessitate the entry of a new order,

30

for example, requiring father to test on suspicion of drug use. Moreover, if evidence has arisen during the pendency of this appeal—or subsequently arises—demonstrating father has a substance abuse problem, the juvenile court " 'can modify the reunification plan accordingly and order additional services.' " (*Ibid*.)

b. *Individual Counseling*

We agree with DCFS, however, that the juvenile court's order requiring father to participate in "[i]ndividual counseling to address protective parenting, past trauma, [and] case related issues" was a reasonable exercise of its discretion. As DCFS's counsel noted at the hearing, father hadn't "acted in a protective capacity as a parent in a number of years." As we have concluded the record supports the court's finding that father failed to protect M.D., requiring father to undergo counseling to address how he can protect M.D. is more than reasonable, especially given father minimized the risk mother's substance abuse posed to M.D. Moreover, the evidence shows M.D. did not want to stay with father in part because of his poor communication skills. She felt unheard by father and mistreated by his live-in girlfriend and her six children. If father wanted to reunify with M.D.— as he said he did—learning effective communication skills would be imperative and something the court reasonably could find was in M.D.'s best interests and father should address in individual counseling before participating in conjoint therapy with M.D.

4. ***Father's other purported challenges***

We need not consider father's other purported challenges. The conclusion to father's opening brief includes a "prayer for relief." In it, father argues that, should we reverse the jurisdictional finding against him, we also should instruct the

31

trial court to reconsider whether removal of M.D. is warranted. Father also argues the trial court should be instructed "to ensure" he and M.D. "receive an adequate period of reunification even if this period extends beyond the 18-month date." As we have found substantial evidence supports the juvenile court's jurisdictional finding against father, father's requests are moot. In any event, father has forfeited them.

As DCFS notes, father never asked the juvenile court to release M.D. to his custody—only that the court grant DCFS discretion to do so. He thus has forfeited any challenge to the removal order on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 964 [dependency matters are not exempt from rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"].)

Father also has forfeited any contention that he be provided with more than 18 months of reunification services. Father cited no legal authority to support his request. (*In re A.C.* (2017) 13 Cal.App.5th 661, 672 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].) In any event, the issue of the adequacy of father's reunification services is not before us on his appeal from the court's jurisdictional and dispositional orders.

**DISPOSITION**

We affirm the juvenile court's jurisdictional finding as to father.  We reverse the portion of the court's disposition order requiring father to submit to random and on-demand drug/ alcohol testing.  We affirm the disposition order in all other respects.  On remand, the court may hold further proceedings in its discretion to determine if the current circumstances warrant a different or new order with respect to drug/alcohol testing for father.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

33